**KAISER SAURBORN & MAIR, P.C.**
**ATTORNEYS FOR PLAINTIFF**
**111 BROADWAY, 18th FLOOR**
**NEW YORK, NEW YORK 10006**
**(212) 338-9100**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------X
JAMES HOLSAPPLE, M.D.,          Civil Action No.: 5:11-CV-110 (TJM/GHL)

       Plaintiff,          **COMPLAINT**

  -against-

UNIVERSITY HOSPITAL,          **PLAINTIFF HEREBY DEMANDS**
         **A TRIAL BY JURY**

       Defendant.
-------------------------------------------------------X

     Plaintiff, James Holsapple, M.D., by his attorneys, Kaiser Saurborn & Mair, P.C., as and for his complaint against defendant, alleges as follows:

### PARTIES, JURISDICTION AND NATURE OF ACTION

     1.      Plaintiff, James (Jim) Holsapple, M.D. ("Holsapple" or "plaintiff"), is a neurosurgeon formerly employed by defendant.

     2.      Defendant, University Hospital ("the Hospital" or "defendant"), is a health care institution authorized by New York State law to operate a Health Care facility within New York State.

     3.      Original jurisdiction of this Court is founded upon 28 U.S.C. § 1331, *et seq.* in that this is a civil action wherein the matters in controversy arise under the laws of the United States, particularly 31 U.S.C. § 3730(h), as amended ("the False Claims Act"). This Court also has pendent jurisdiction in connection with plaintiff's New York Labor Law § 741 cause of

1

action.

4.       Plaintiff was retaliated against for objecting to and attempting to prevent and correct defendant's fraudulent and unlawful conduct, including dangerous medical practices, in violation of the False Claims Act and New York State Labor Law § 741.

## BACKGROUND

### I.

### DR. HOLSAPPLE'S HOSPITAL EMPLOYMENT

5.       On July 1, 1994, Dr. Holsapple commenced his employment with the Hospital in the position of Assistant Professor of Neurosurgery.

6.       During the tenure of his employment, he held the positions of: 1) Associate Professor Neurological Surgery and Pediatrics Upstate Medical University (UMU) and an active neurosurgeon at University Hospital, 2) Department of Neurosurgery Quality Improvement Officer (attending monthly meetings Committee for Quality Improvement (CQI) as Departmental representative, charged with real time review and evaluation of all neurosurgical "problem cases" identified by Risk Management UH), 3) SUNY Faculty Senator (second term, elected by peers), 4) Clinical Clerkship Coordinator Neurosurgery Rotation UMU and 5) Residency Coordinator.

7.       At all times during his employment, Dr. Holsapple was very well regarded by University staff and colleagues throughout his surgical discipline.

8.       In 2007, Dr. Holsapple was appointed to the Medical Executive Committee ("MEC").

9.       The MEC's primary responsibilities included: 1) receive CQI monthly summary

reports and vote on proposed actions, 2) review recommendations of the hospital credentialing committee, 3) review updates on status of medical record keeping, 4) review and vote on proposed by-law updates, 5) review and approval archived MEC "white minutes" and 6) review of non-archived "red sheets."

10. At the time of his employment, MEC's membership included: 1) D. Smith, M.D. (UMU President), 2) P. Schaengold, J.D. (UH CEO), 3) S. Schienman, M.D. (UMU Dean College of Medicine), 4) S. Brangman, M.D. (MEC Chairperson, Geriatrics), 5) Ms. R. McGraw, J.D. (Institutional Attorney), 6) R. Kellman, M.D. (Chair Otolaryngology, UMU), 7) J. Holsapple, M.D. (Neurosurgery) Faculty, UMU), 8) B. Smallman, M.D. (Anesthesia Faculty, UMU) and 9) B. Simmons, M.D. (Internal Medicine Faculty, UMU).

11. When he began to resist and object to medical practices that were both dangerous and fraudulent, Dr. Holsapple's working environment turned hostile and ultimately became so intolerable that he could no longer pursue his professional career as a neurosurgeon.

## II.

### DR. HOLSAPPLE'S OBJECTIONS TO UNLAWFUL MEDICAL PRACTICES

12. In 2007, Dr. Holsapple communicated his concern to the MEC that the Hospital's proposed practice of simultaneously running multiple spine cases in the Hospital's operating rooms was exceedingly dangerous and risked the well being of its patients.

13. The proposal of which Dr. Holsapple complained envisioned performing two complex spine surgeries at the same time in separate operating rooms under the supervision of a single complex spine surgeon who would be responsible for both cases.

14. An assistant surgeon would be present in the room the complex spine surgeon was

not in. Dr. Holsapple noted that the assistant surgeon was unqualified to perform complex spine surgeries.

15. Dr. Holsapple further noted that the assistant surgeon would not be properly trained to complete the entire surgery, if necessary, without the primary surgeon's assistance.

16. Dr. Holsapple urged that the proposal at least be modified to insure coverage by a qualified surgeon at all times.

17. The MEC, including the Hospital's CEO, dismissed Dr. Holsapple's concerns and rejected his recommendations for modifying the spine surgery proposal.

18. Sometime in 2007 and 2008, medical quality issues surrounding surgical outcomes after spinal surgeries began to surface and were discussed at Committee for Quality Improvement ("CQI") and MEC meetings.

19. Statistical analysis revealed that University Hospital ranked near the bottom for poor outcomes following spine surgery and further that mortality rates following spine surgery at the Hospital were five times normal.

20. Again, Dr. Holsapple urged the Hospital during CQI and MEC meetings to abandon the practice of performing multiple spine surgeries with only one complex spine surgeon.

21. Dr. Holsapple also argued that in view of the significant breaches in protocol, billing in order to collect payment for these surgeries was fraudulent.

*Multiple Spine Surgery Procedure*
*Results in Patient Harm*

22. Two patients, "A" and "B," arrived at the Hospital on the same day for spine surgery ("the Spine Surgery").

23. R. Moquin, M.D. was the primary surgeon assigned to both cases.

24. Patient B's operation was initiated by Walter Hall and chief resident, C. Hartley, M.D.

Neither surgeon was qualified to complete patient B's operation unassisted.

25. At some point during patient B's surgery, expert level surgical skill was required. Neither Walter Hall nor Dr. Hartley possessed the requisite skill.

26. Dr. Moquin, who was busy with patient A, was unavailable to assist in patient B's care.

27. Walter Hall instructed Dr. Hartley, despite his lack of requisite knowledge and skill, to complete the surgery.

28. Dr. Moquin did not participate in any manner in patient B's surgery.

29. Dr. Moquin electronically dictated and signed an operative note concerning patient B's complex spine surgery having never participated in the surgery.

30. Dr. Moquin's note stated that patient B's surgery presented no complications.

31. In reality, and not surprisingly, intra-operative complications (CFS leak, durotomy) arose. Patient B was restricted to bed rest for an extended period of time to treat the surgical complications.

32. Patient B, following the surgery, was under the false impression that Dr. Moquin participated in her surgery. Patient B was never properly advised regarding Dr. Moquin's lack of participation in her surgery.

*Dr. Holsapple Complained about*
*the Spine Surgery*

33. The Spine Surgery was discussed at an MEC meeting.

34. At the meeting, Dr. Holsapple raised multiple concerns, including violations of New York State law such as New York State's Education Law, relating to the Spine Surgery.

35. The concerns raised by Dr. Holsapple included, but were not limited to:

1) Physician misconduct;

2) Failure to report misconduct as required by OPMC and New York State Department of Health;

3) Failure to disclose to patient true and accurate circumstances of her operation;

4) Fraudulent creation and maintenance of medical documentation implicating issues of Medicare and Medicaid fraud;

5) Fraudulent billing related to Spine Surgery also implicating issues of Medicare and Medicaid fraud;

6) Misconduct by Chair of Neurosurgery; and

7) A review by Office of Graduate Medical Education concerning the conduct of involved resident surgeons.

36. At this meeting, Dr. Holsapple urged the Hospital to immediately order the cessation of all multi-room spine surgeries occurring within the Hospital.

37. The Hospital's administration representatives at the meeting, including but not limited to the Hospital CEO (P. Shaengold), refused to consider any of Dr. Holsapple's complaints. The meeting concluded with P. Shaengold screaming at Dr. Holsapple, describing

his behavior as inappropriate and disrespectful.

38.     Separately, Dr. Holsapple reported his objections to a senior faculty neurosurgeon, W. Stewart, M.D., who ultimately submitted a formal complaint concerning the Spine Surgery to the New York State Department of Health.

39.     Sometime in 2008, JCAHO was told by an unknown source of the legal violations and misconduct relating to the Spine Surgery.

40.     In a conversation between Dr. Holsapple and Hospital counsel, R. McGraw, Esq., Ms. McGraw confided that JCAHO will never catch on because "we are just too good."

41.     Upon information and belief, defendant engaged in a concerted and purposeful effort to deceive governmental oversight agencies and thereby conceal its wrongdoing and illegal behavior in connection with its dangerous spine surgery medical practices and related fraudulent billing practices.

42.     Defendant engaged in highly dangerous and illegal medical care that seriously compromised patient safety without the requisite patient knowledge and consent because spine surgery was highly profitable for the Hospital and defendant's administration prioritized profit over safety.

*Dr. Holsapple Complained About Misconduct*
*Related to the Reading of Cat Scans*

43.     In 2008, Dr. Holsapple learned of a Pediatric Head Trauma Case in which a boy was brought to the Hospital complaining of a head injury and then released only to die the following day.

44.     A review of the case revealed that the child's CT Scan was misread by a

radiology resident.

45. Dr. Holsapple, at an MEC meeting, objected to the handling of the case and, in particular, objected that the Hospital did not conform to the accepted standard of care which required the reading of crucial films by board certified radiologists.

46. Dr. Holsapple posed the question to the attendees at the meeting that if it were their child would they expect a board certified radiologist to review the film. Predictably, the answer was a uniform yes, but the assembled group also noted that the general public could not expect the same level of care.

47. The Hospital decided against the implementation of any changes in the manner in which Cat Scans were reviewed.

48. Sometime in 2008, the nursing staff uncovered Nazi Iconography imbedded within the medical records of Dr. Hall's patients.

49. A Hospital investigation confirmed that the Nazi images belong to Dr. Hall. Dr. Hall was forced to resign his Chair but remained employed by the Hospital as a neurosurgeon.

50. Both within and outside of MEC meetings, throughout 2008, Dr. Holsapple continued to raise concerns about "resident Medicare spine clinic" that included, but were not limited to: 1) over-crowding, 2) improper resident supervision and 3) fraudulent Medicare billing.

51. Dr. Holsapple recommended that the spine clinic be closed until these problems could be resolved.

52. The Hospital rejected Dr. Holsapple's recommendation to close the clinic.

*The New York State Department of Health Conducted
an Investigation into the Hospital's Misconduct*

53. In May 2010, DOH concluded an investigation into the Hospital's violations and issued a sixty-page report.

54. The DOH report concluded that the Hospital was guilty of a broad range of Health Code violations, including infractions concerning hospital oversight functions.

55. Upon information and belief, DOH is presently considering an enforcement action against the Hospital.

*The Hospital Retaliated Against Dr. Holsapple
Because of his Complaints Rendering his Working
Environment Intolerably Hostile and Unfit for the
Continued Rendering of his Surgical Services*

56. In July-Aug 2007, Dr. Hall stripped Dr. Holsapple of his title and role as Residency Coordinator.

57. As a consequence, his compensation was reduced by $82,500 /year.

58. No explanation was provided to Dr. Holsapple for this action.

59. In the winter of 2008 Dr. Hall removed Dr. Holsapple's title and role as Departmental Quality Officer which further reduced his yearly compensation.

60. No explanation was provided to Dr. Holsapple for this action.

61. Following Dr. Holsapple's complaints, Dr. Hall, along with other administration officials including the Hospital's CEO, undertook a series of actions that undermined Dr. Holsapple and marginalized his role within the Hospital and Neurosurgery Department. These actions, in addition to the above detailed actions, included, but were not limited to: 1) further actions removing Dr. Holsapple from decision making within the Hospital and 2) diverting

9

Pediatric cases away from Dr. Holsapple's care.

62. Dr. Montgomery repeatedly remarked to Dr. Holsapple that he was being "pushed out" or "forced out" of the Hospital.

63. Following Dr. Holsapple's complaints, the Hospital created a working environment that was so hostile and unethical that it rendered it impossible for Dr. Holsapple to continue to pursue his surgical profession at the Hospital.

64. Upon information and belief, the Hospital intended to create a hostile professional environment for Dr. Holsapple to force his resignation.

65. On January 31, 2009, Dr. Holsapple, as a consequence of the intense financial and professional pressure created by the Hospital, resigned his employment.

66. His resignation constituted a constructive termination by the Hospital.

67. The retaliation against Dr. Holsapple continued following his constructive termination.

68. In Oct 2010, Ms. McGraw contacted Dr. Holsapple and inquired whether she could return a message to the Hospital President that the conflict between the Hospital and Dr. Holsapple would be ending.

69. Dr. Holsapple indicated that he could not provide such assurances. In response, Ms. McGraw stated to him that in view of his inability to provide such assurances one of his colleagues was potentially in harm's way.

70. In Nov. 2010, this colleague was placed on "administrative leave," and their office computer confiscated.

71. In Nov. 2010, Dr. Holsapple and his spouse were confronted by two

"investigators" who identified themselves as agents of the Hospital and were waiting in a parked car for Dr. Holsapple outside his home in South Boston.

72. The "investigators" indicated that they had made a special trip to Boston to speak with Dr. Holsapple.

73. The "investigators" were sent by the Hospital to intimidate and harass Dr. Holsapple and his wife.

74. All of the above retaliatory conduct was undertaken in response to Dr. Holsapple's complaints about the Hospital's violations of Federal and State law in connection with the Hospital's practice of medicine, including conduct that constituted Medicare/Medicaid Fraud. Many of the Hospital's violations complained of by Dr. Holsapple endangered the lives and well being of the patients treated by the Hospital.

75. The Hospital's retaliatory conduct was malicious and knowingly violated State and Federal law.

## CAUSE OF ACTION I

76. Plaintiff repeats and realleges each and every allegation of paragraphs "1" through "75" of the complaint as if incorporated and reiterated herein.

77. Defendant retaliated against plaintiff for objecting to fraudulent and unlawful conduct in violation of the False Claims Act, 31 U.S.C. § 3730(h).

78. By reason thereof, defendant has violated 31 U.S.C. § 3730(h), as amended, and has caused plaintiff to suffer damages, including two (2) times the amount of his lost back pay, interest on the back pay, lost retirement benefits and compensation for any special damages sustained as a result of the illegal termination, including litigation costs and reasonable attorneys'

fees and loss of tenure.

## CAUSE OF ACTION II

79.     Plaintiff repeats and realleges each and every allegation of paragraphs "1" through "75" and "77" of the complaint as if incorporated and reiterated herein.

80.     Defendant retaliated against plaintiff for objecting to fraudulent and unlawful medical practices that endangered the well being and lives of the Hospital's patients in violation of Labor Law § 741, et. al.

81.     By reason thereof, defendant has violated Labor Law § 741, et.al., as amended, and has caused plaintiff to suffer damages, including lost back pay, interest on the back pay, lost retirement benefits and compensation for any special damages sustained as a result of the illegal termination, including litigation costs and reasonable attorneys' fees and loss of tenure.

**WHEREFORE**, plaintiff demands judgment against defendant as follows:

(i)     On the First Cause of Action assessing two times actual and punitive damages against defendant in an amount to be determined at trial;

(ii)    On the Second Cause of Action assessing actual damages against defendant in an amount to be determined at trial;

(iii)   Attorneys' fees, disbursements and other costs; and

(iv)    For such other relief as the Court deems just and proper.

## DEMAND FOR A JURY TRIAL

Plaintiff hereby demands a trial by jury.

Dated: New York, New York
January 31, 2011

KAISER SAURBORN & MAIR, P.C.

_____
Henry L. Saurborn, Esq. [506433]

Attorneys for plaintiff
111 Broadway, 18th Floor
New York, New York 10006
(212) 338-9100